## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

ADAM LEE III,                            *
                                          *
          Plaintiff,                      *
                                          *
     v.                                   *          1:24-CV-01565-ELR
                                          *
PATRICK LABAT, in his individual          *
and official capacity as Fulton County    *
Sheriff,                                  *
                                          *
          Defendant.                      *
                                          *

—————

## ORDER

—————

Presently before the Court is Defendant Patrick Labat's Motion to Dismiss Plaintiff Adam Lee III's Complaint. [Doc. 13]. The Court sets forth its reasoning and conclusions below.

## I.    Background[1]

This case concerns Plaintiff's former employment as "Assistant Chief Jailer Criminal Investigative Division" of the Fulton County Jail (the "Jail"). See Compl. ¶ 40 [Doc. 1]. Plaintiff was one of three employees who resigned in the wake of a

---

[1] For purposes of Defendant's Motion to Dismiss, the Court "accept[s] the allegations in the complaint as true and constru[es] them in the light most favorable to the plaintiff." Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003).

"public outcry" about conditions at the Jail and the death of LaShawn Thompson, who died in a cell infested with bed bugs. See id. ¶ 42. Defendant, the Sheriff of Fulton County, demanded Plaintiff's resignation to deflect blame and accountability for Mr. Thompson's death and to win reelection as sheriff. Id. ¶¶ 59–60.

### A.    Plaintiff's Employment at the Jail

At all times relevant to the Complaint, Plaintiff was a Lieutenant Colonel with the Fulton County Sheriff's Office and a certified peace officer in the State of Georgia. Compl. ¶ 5. Plaintiff was a "classified employee" per Fulton County Code Section 34-71, and because he had completed his probationary period, Plaintiff was entitled to due process before the institution of any formal discipline. Id. ¶¶ 8–9. Specifically, classified employees are entitled to written notice not less than 24 hours prior to any dismissal, suspension, or demotion for cause that results in a loss of salary, employment grade, or classification. [Doc. 13-2 at 17] (Fulton County Code Sec. 34-74(c)).[2] Additionally, classified employees have the right to appeal such

---

[2] "In general, when considering a motion to dismiss a plaintiff's complaint, a court may not consider anything beyond the face of the complaint and any documents attached thereto." Reed v. Royal Caribbean Cruises Ltd., 618 F. Supp. 3d 1346, 1354–55 (S.D. Fla. 2022) (citation omitted). "There is an exception to this rule, under which a document may be considered—provided plaintiff refers to the document in its complaint, the document is central to plaintiff's claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss." Id. Here, Plaintiff references the Fulton County Code in his Complaint, it is central to Plaintiff's claim, Defendant attached it to his Motion to Dismiss, and its contents are not in dispute. See Compl. ¶¶ 8–9; [Docs. 13-1, 19]. Thus, the Court may consider it.

disciplinary actions to an administrative hearing officer. [Id.] (Fulton County Code Sec. 34-74(d)).

During Plaintiff's employment at the Jail, Defendant tasked Plaintiff with "creating and managing an investigatory team" within the Jail "to uncover unlawful activity" by the Jail staff. Id. ¶ 14. Plaintiff's efforts led to the arrest and indictment of 19 jailers and employees, the termination of other employees, and procedures that reduced the influx of contraband into the Jail. Id. Plaintiff had "no administrative responsibility whatsoever for inmate housing" at the Jail. Id. ¶ 22.

### B.    Defendant's Investigation into the Death of Mr. Thompson

In September 2022, Mr. Thompson died in custody at the Jail in a cell that was infested with bed bugs. Compl. ¶¶ 19–42. Defendant was aware of the bed bug infestation in Mr. Thompson's cell. Id. ¶¶ 12–13. However, Defendant did not investigate the circumstances surrounding Mr. Thompson's death until April 2023, after Mr. Thompson's family "revealed horrifying evidence about how [Mr. Thompson] died in his jail cell" and several news outlets published that information. Id. ¶ 19. During his investigation, Defendant did not interview Plaintiff or inquire into Plaintiff's involvement in the custody, control, supervision, or contact with Mr. Thompson. Id. ¶¶ 20–21. Defendant knew that Plaintiff "was not responsible in any way for supervising or overseeing the cell, or the personnel assigned" to the cell or floor where Mr. Thompson died. Id. ¶¶ 26–27.

**C.    Plaintiff's Resignation**

After news broke about Mr. Thompson's death at the Jail, Defendant called Plaintiff to Defendant's office after hours on Friday, April 14, 2023, and "demand[ed] that Plaintiff resign" within a few minutes of his arrival. Compl. ¶¶ 10, 31, 60. Plaintiff did so. See id. During that brief meeting, Defendant made statements "confirming that he knew Plaintiff had nothing whatsoever to do with the death of [Mr.] Thompson," and he "clarified" that his motivation for demanding Plaintiff's resignation was because Defendant "needed to win reelection." Id. ¶ 60.

**D.    Defendant's Statements to the Media**

On Sunday, April 16, 2023, following Plaintiff's resignation, Defendant "released statements to the press and others advising [that] he 'cleaned house.'" Compl. ¶ 10. On Monday, April 17, 2023, the "information" that Defendant provided led to the following radio broadcast on WXIA-11 Alive:

> Commentator: Right now at noon, we continue to follow a shakeup at the Fulton County Jail. Today, *three top ranking jailers, part of the sheriff's own executive team, are gone. They resigned after the sheriff asked them to step down.* This comes just days after the family of LaShawn Thompson revealed horrifying evidence of how they say he died in his jail cell. 11 Alive's John Sherick has the story as the sheriff says this shakeup is just getting started.
>
> John Sherick: The photos just released from inside the Fulton County Jail showing LaShawn Thompson's cell, the bed bug infested cell where Thompson was being held for a misdemeanor charge where he died this past summer. Photos that were part of the Medical Examiner's autopsy of Thompson. They are now part of the public outcry over

> conditions inside the jail that led [Defendant] to declare Monday, quote, *"It is past time to clean house."*
>
> Out are three veteran members of the Sheriff's executive team, the Chief Jailer, Colonel John Jackson, and two Assistant Chief Jailers, Lieutenant Colonel Derek Singleton and [Plaintiff].

Id. ¶ 42 (emphasis in original partially omitted).

The next day, on Tuesday, April 18, 2023, Defendant made the following statement during a radio interview:

> Host: Thank you for being here again, and you was (sic) just here. And unfortunately, some circumstances over at Fulton County Jail have brought you back. The internal investigation into LaShawn Thompson's death, I don't know what you can tell us and what you can't tell us, but it's my understanding that certain people no longer have a job.
>
> [Defendant]: First, *that's very true*. All right. But first, if you allow me to certainly express our condolences, certainly to Mr. LaShawn Thompson and his family. It's a hard time for them, us as well. Tragic as it may be, *we are certainly going to get to the bottom of what did or didn't happen and hold those people accountable.*

Id. ¶ 41 (emphasis in original partially omitted).

Finally, on Thursday, April 20, 2023, Defendant published a press release, which is still displayed on the Fulton County Sheriff's Office Instagram page, that stated:

> Atlanta, GA – [A]fter reviewing *preliminary evidence gathered during the internal investigation* being conducted by the Office of Professional Standards (OPS), [Defendant] is announcing sweeping changes at the Fulton County Jail.

> Collectively, the executive team that's been in place has more than 65 years of jail at administration law enforcement experience. When leveraged at it's very best, that experience can be invaluable. However, it can also lend itself to complacency, stagnation and settling for the status quo.
>
> "*It's clear to me that it's time, past time, to clean house.*" At an executive staff meeting held over the weekend, [Defendant] asked, received, and accepted the resignation of the Chief [J]ailer, Assistant Chief Jailer[,] and [Plaintiff].

Id. ¶¶ 39–40 (emphasis added). At some point, journalists asked Defendant why he "cleaned house" in April 2023 when Mr. Thompson had died in September 2022. Id. ¶ 30. Defendant responded that he "had to wait to 'give due process'" to Plaintiff. Id.

Media stories containing Defendant's statements about his efforts to "clean house" gained national media coverage, including CNN, USA Today, and the Associated Press. See id. ¶ 47. According to Plaintiff, Defendant spoke to the press and used Plaintiff "as an example [of] his efforts to 'clean house'" "to destroy" Plaintiff's reputation and "to direct the blame for [Mr.] Thompson's death, the out-of-control influx of contraband, and the otherwise unsatisfactory—and unsafe—jail conditions away" from Defendant. Id. ¶¶ 15, 37. Defendant was allegedly "motivated" by "a desire . . . to secure his future re-election as Sheriff of Fulton County" and to "damage Plaintiff's professional reputation." Id. ¶¶ 59, 61.

### E.    The Aftermath

A subsequent Georgia Bureau of Investigation ("GBI") inquiry revealed "no record of any culpability on the Plaintiff's part as it relates to Mr. Thom[pson] or any other death of a Fulton County inmate." Compl. ¶ 34. Since Defendant's public statements, Plaintiff has been "ostracized" and "confronted about his supposed role in the gross deficiencies" at the Jail. Id. ¶ 35. The "negative publicity" from Defendant's "statements" have "prevented" Plaintiff from finding employment. Id. For instance, Plaintiff has lost opportunities to continue his long-standing role as a television commentator, and he has been unable to secure employment in the public or private sector. Id. ¶ 72.

## II.    Procedural History

Plaintiff filed his Complaint on April 13, 2024, alleging two Counts against Defendant in his official and individual capacity. See Compl. In Count One, Plaintiff asserts a Section 1983 claim, alleging that Defendant deprived Plaintiff of his "reputational liberty rights" in violation of "the due process clause of the Fifth and Fourteenth Amendments" of the United States Constitution. Id. ¶¶ 49–50, 56. In Count Two, Plaintiff alleges that Defendant statements were defamatory as defined by O.C.G.A. § 51-5-1. Id. ¶¶ 64, 67.

On June 25, 2024, Defendant filed its instant Motion to Dismiss. [Doc. 13] Defendant asserts the defense of sovereign immunity and thus seeks to dismiss

Plaintiff's claims against him in his official capacity under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. [Id.] Defendant also seeks to dismiss the Complaint for failure to state a claim under Rule 12(b)(6). [Id.] Having been fully briefed, Defendant's motion is ripe for the Court's review.

## III.    Legal Standard

First, Rule 12(b)(1) provides the vehicle for challenging a plaintiff's claim for lack of subject matter jurisdiction. See Fed. R. Civ. P. 12(b)(1). Because the Eleventh Amendment speaks to a federal court's power to adjudicate a claim against a State entity—such as Defendant in his official capacity—the Court analyzes Defendant's sovereign immunity defense under Rule 12(b)(1)'s framework. See McClendon v. Ga. Dep't of Cmty. Health, 261 F.3d 1252, 1256 (11th Cir. 2001) ("Because the Eleventh Amendment represents a constitutional limitation on the federal judicial power established in Article III, federal courts lack jurisdiction to entertain claims that are barred by the Eleventh Amendment." (citation omitted)); Thomas v. U.S. Postal Serv., 364 F. App'x 600, 601 (11th Cir. 2010) ("[A] dismissal on sovereign immunity grounds should be pursuant to Rule 12(b)(1) because no subject matter jurisdiction exists.")

A defendant may challenge a district court's subject matter jurisdiction through two different types of attacks: facial attacks and factual attacks. See Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1232 (11th Cir.

2008). Here, because Defendant only relies on Plaintiff's allegations, the Court construes his immunity arguments as a facial attack on the Court's jurisdiction. See Hunter v. Ga. Dep't of Hum. Servs., No. 1:20-CV-00326-WMR-RDC, 2021 WL 12300102, at *4 (N.D. Ga. Sept. 17), R&R adopted, 2021 WL 12300080 (Nov. 8, 2021) (citing Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)). Therefore, the Court considers only whether Plaintiff has sufficiently alleged a basis for the Court's subject matter jurisdiction in the Complaint and accepts Plaintiff's allegations as true for purposes of the instant motion. Id.

Second, to survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Put differently, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This so-called "plausibility standard" is not akin to a probability requirement; rather, the plaintiff must allege sufficient facts such that it is reasonable to expect that discovery will lead to evidence supporting the claim. Id.

When considering a 12(b)(6) motion to dismiss, the Court must accept as true the allegations set forth in the complaint, drawing all reasonable inferences in the light most favorable to the plaintiff. Twombly, 550 U.S. at 555–56; United States v.

Stricker, 524 F. App'x 500, 505 (11th Cir. 2013) (per curiam). However, the Court is "not required to credit conclusory allegations, unwarranted deductions of facts[,] or legal conclusions masquerading as facts." Patton v. Carnival Corp., No. 22-13806, 2024 WL 1886504, at *2 (11th Cir. Apr. 30, 2024). To that end, the Court "may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." Id. (quoting Doe v. Samford Univ., 29 F.4th 675, 686 (11th Cir. 2022)).

In sum, a complaint offering mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient. Iqbal, 556 U.S. at 678 (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 555). Rather, "a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief" to satisfy "the pleading requirements of Rule 8." Parker v. Brush Wellman, Inc., 377 F. Supp. 2d 1290, 1294 (N.D. Ga. 2005) (citing Fed. R. Civ. P. 8(a)(2)).

## IV.    Discussion

It is unclear from the Complaint which of Plaintiff's claims are brought against Defendant in his official capacity, in his individual capacity, or in both capacities. "This is a significant distinction, as suits against public employees in their personal capacities involve official immunity, whereas suits against public

employees in their official capacities are in reality suits against the state and, therefore, involve sovereign immunity." <u>Bufford v. Fulton Cnty. Sheriff's Off.</u>, No. 1:24-CV-03452-SDG, 2025 WL 923480, at *4 (N.D. Ga. Mar. 26, 2025) (cleaned up); <u>see also</u> <u>Harbert Int'l, Inc. v. James</u>, 157 F.3d 1271, 1277 (11th Cir. 1998) (noting that under federal law, state officials sued in their official capacity are protected by Eleventh Amendment sovereign immunity). Erring on the side of caution, the Court will address Plaintiff's claims against Defendant in both capacities, beginning with Plaintiff's Section 1983 claim against Defendant in his official capacity.

### A.    Plaintiff's Section 1983 Claim (Count One)

#### 1.    <u>Official Capacity Claim</u>

In Count One, Plaintiff claims that Defendant deprived him of his "reputational liberty rights" by wrongfully "terminating" his employment at the Jail and damaging his reputation in violation of the due process clause of the Fifth and Fourteenth Amendments. <u>Id.</u> ¶¶ 48–62. As relief for Count One, Plaintiff prays for "compensatory and punitive damages, attorneys' fees, expert fees, costs, per se damages, and pre-judgement and post-judgement interest against Defendant." <u>Id.</u> ¶ 62. Plaintiff also seeks "[d]eclaratory judgment that Defendant violated Plaintiff's rights." <u>Id.</u> at 18.

Defendant argues that he is immune from Plaintiff's Section 1983 claim for compensatory relief in his official capacity under the Eleventh Amendment. [Doc. 13-1 at 12]. Defendant is correct. The Eleventh Amendment bars suits seeking compensatory relief brought in federal court against state officials and "arms of the State." See Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1337 (11th Cir. 1999); Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003). "To receive Eleventh Amendment immunity, a defendant need not be labeled a 'state officer' or 'state official,' but instead need only be acting as an 'arm of the State,' which includes agents and instrumentalities of the State." Manders, 338 F.3d at 1308. Whether a defendant was acting as an "arm of the State" must be "assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." Id.

The Eleventh Circuit has held that a sheriff acts as an "arm of the State" when "exercising his power to hire and fire his deputies." Pellitteri v. Prine, 776 F.3d 777, 780, 783 (11th Cir. 2015). Thus, when sued in their official capacity, sheriffs are immune from claims stemming from wrongful termination under Section 1983. Id. at 783. Here, Plaintiff alleges Defendant wrongfully "terminated" him by demanding his resignation. Defendant argues, and Plaintiff does not dispute, that Defendant acted as an arm of the State when asking Plaintiff to resign. [See Docs. 13-1, 19]. In fact, in response to Defendant's Motion to Dismiss, Plaintiff wholly abandons his

Section 1983 claim for compensatory relief and states that he "*only* seeks the prospective relief available under Section 1983 and the attorneys' fees available under Section 1988 against Defendant *in his official capacity*."[3] [Doc. 19 at 8] (emphasis in original). Accordingly, Defendant is immune from Plaintiff's Section 1983 claim to the extent that Plaintiff seeks compensatory damages. See Pellitteri, 776 F.3d at 780, 783. Therefore, that claim is due to be dismissed without prejudice due to lack of subject matter jurisdiction under Rule 12(b)(1). See Compl. ¶ 62.

The Court next considers Plaintiff's claim for declaratory judgment. The Eleventh Amendment does not prohibit claims seeking prospective relief, such as declaratory judgment. See Summit Med., 180 F.3d at 1337. Thus, Defendant concedes that unlike Plaintiff's claim for compensatory damages, Plaintiff's claim for declaratory judgment is not barred by sovereign immunity. [Doc. 19 at 20]. Nevertheless, Defendant argues that Plaintiff's claim should be dismissed because the Complaint does not allege sufficient facts to support a reasonable inference that Plaintiff's reputational liberty rights were violated. [Id. at 7]. The Court agrees.

To establish a deprivation of the right to reputational liberty, Plaintiff must allege: "(1) a false statement (2) of a stigmatizing nature (3) attending a

---

[3] Plaintiff acknowledges that the Complaint is unclear in this regard and states that "should amendment happen later in this case, Plaintiff will amend [the Complaint] to make clear he only seeks to sue Defendant in his official capacity" in relation to Plaintiff's Section 1983 claim and that Plaintiff only seeks declaratory relief and attorneys' fees. [Doc. 19 at 19 n.2].

governmental employee's discharge (4) made public (5) by the governmental employer (6) without a meaningful opportunity for employee name clearing." Buxton v. City of Plant City, Fla., 871 F.2d 1037, 1042–43 (11th Cir. 1989). This right to reputational liberty is rooted in the Fourteenth Amendment, which "restrains the states[] from depriving any person of life, liberty, or property without due process of law." Buxton v. City of Plant City, Fla., 871 F.2d 1037, 1042–43 (11th Cir. 1989). Damage to personal reputation, "standing alone, does not provide a basis for an action under 42 U.S.C. § 1983"; but, "when reputational damage is sustained in connection with a termination of employment, it may give rise to a procedural due process claim for deprivation of liberty[.]" Cotton v. Jackson, 216 F.3d 1328, 1330 (11th Cir. 2000). However, "[i]f circumstances establish that an employee was not terminated and instead resigned voluntarily, due process is not implicated." Rademakers v. Scott, 350 F. App'x 408, 411 (11th Cir. 2009) (citing Hargray v. City of Hallandale, 57 F.3d 1560, 1568 (11th Cir. 1995)).

Under Eleventh Circuit precedent, employee resignations are "presumed to be voluntary." Hargray, 57 F.3d at 1568. An employee's resignation will only be deemed involuntary "(1) where the employer forces the resignation by coercion or duress, or (2) where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee[.]" Id. (citation omitted). Here, the Complaint does not allege that Plaintiff's resignation was the product of a

misrepresentation of material fact. <u>See</u> Compl.; [Doc. 19]. Accordingly, the Court's

discussion is limited to whether Plaintiff has alleged sufficient facts to show that he

resigned due to coercion or duress. <u>Hargray</u>, 57 F.3d at 1568.

The Eleventh Circuit has held that the following factors may help determine

whether a resignation was obtained by coercion or duress:

> (1) whether the employee was given an alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel.

<u>Id.</u> The factors are not dispositive and must be considered under the totality of the

circumstances. <u>Id.</u> Showing that a resignation is involuntary is generally a high

bar—for instance, a resignation may "be voluntary even where the *only* alternative

is facing possible termination for cause or criminal charges." <u>Cendan v. Sch. Bd. of</u>

<u>Broward Cnty., Fla.</u>, 628 F. Supp. 3d 1191, 1203 (S.D. Fla. 2022) (emphasis added).

Absent other factors, such resignations are "voluntary because the fact remains that

plaintiff had a choice. Plaintiff could stand pat and fight" rather than resign.[4]

<u>Hargray</u>, 57 F.3d at 1568 (cleaned up).

---

[4] There is one exception to the "possible termination for cause or criminal charges" rule: a resignation may be deemed involuntary when the employer lacked good cause to believe that the grounds for the plaintiff's termination or criminal charges existed. <u>Hargray</u>, 57 F.3d at 1568. However, this exception is not implicated here, because Plaintiff does not allege that he faced possible termination for cause or criminal charges. <u>See generally</u> Compl.

Whether a resignation was involuntary due to coercion or duress is a "legal conclusion," Hargray, 57 F.3d at 1570, and when ruling on a motion to dismiss, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 556 (citation omitted). Therefore, the Court disregards Plaintiff's conclusory allegations that Defendant "forced" Plaintiff to resign and "terminat[ed]" Plaintiff's employment.[5] See id.; Compl. ¶¶ 10, 31. As a result, the Court is left with Plaintiff's limited allegations that (1) Defendant called Plaintiff to the Sheriff's office after hours on a Friday, (2) Defendant demanded Plaintiff's resignation, and (3) Plaintiff offered his resignation—which Defendant received and accepted—all within a few minutes of arriving to the Sheriff's office. See Compl. ¶¶ 10, 39, 60.

As explained above, a resignation is presumed voluntary *unless* an employee "comes forward with sufficient evidence"—or at this stage, factual allegations—to show that the "resignation was involuntarily extracted." See Rademakers, 350 Fed. App'x at 411. Here, Plaintiff's allegations do not show that he was "deprived . . . of free will in choosing to resign." See id. Although Plaintiff resigned minutes after

---

[5] Contrary to Plaintiff's conclusory allegations that Defendant "terminat[ed]" Plaintiff from his position, see Compl. ¶ 31, the Complaint makes clear that Plaintiff resigned from his position. See id. ¶¶ 10 (alleging that Defendant "forced Plaintiff to resign"), 39 (alleging that Defendant said he "asked, received, and accepted" Plaintiff's resignation), 42 (alleging a news report stating that Plaintiff "resigned after [Defendant] asked [him] to step down"), 60 (alleging that Defendant "demand[ed] that Plaintiff resign").

Defendant asked for his resignation after hours, Plaintiff alleges nothing else indicating that he had *no choice* but to resign rather than "stand pat and fight." See id. at 412. For instance, had Plaintiff refused to resign and Defendant then terminated him, Plaintiff could have appealed his termination. [See Doc. 13-2] (Fulton County Cod Sec. 34-74(d)). Even assuming *arguendo*, that Defendant had threatened Plaintiff with termination of his employment or other consequences if he did not resign, such "unpleasant alternatives" standing alone still would not necessarily show that Plaintiff's resignation was a product of coercion or duress.[6] See Hargray, 57 F.3d at 1568. Accordingly, because the Complaint lacks factual allegations sufficient to support a reasonable inference that Plaintiff's resignation was involuntary, Plaintiff's due process rights were "not implicated" by Defendant's actions. See Rademakers, 350 F. App'x at 411. Therefore, Plaintiff's Section 1983 claim for declaratory judgment against Defendant in his official capacity is due to be dismissed with prejudice under Rule 12(b)(6).

---

[6] In response to Defendant's Motion to Dismiss, Plaintiff argues that when Plaintiff went to the Defendant's office after hours, Plaintiff had "no time to contest the allegations" against him before he resigned. [Doc. 19 at 25]. However, the Complaint does not allege that Defendant asserted any allegations against Plaintiff when Defendant demanded his resignation. See generally Compl. To the contrary, the Complaint states that Defendant made statements "contemporaneously . . . confirming that he knew Plaintiff had nothing whatsoever to do with the death of [Mr.] Thompson[.]" Id. ¶ 60.

2.    <u>Individual Capacity Claim</u>

As mentioned above, the Complaint is unclear as to whether Plaintiff brings his Section 1983 claim against Defendant in his individual capacity. To the extent he does, Defendant argues qualified immunity bars Plaintiff's Section 1983 claim.[7] [Doc. 13-1 at 14–15]. Specifically, Defendant argues Plaintiff has not alleged a constitutional violation of a clearly established right. [<u>Id.</u>]

"At the motion to dismiss stage in the litigation, the qualified immunity inquiry and the Rule 12(b)(6) standard become intertwined." <u>See</u> <u>Keating v. City of Miami</u>, 598 F.3d 753, 760 (11th Cir. 2010) (cleaned up). "[W]hether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded." <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 673). Qualified immunity shields government officials from suit when acting within their discretionary authority "unless the official's conduct violates clearly established federal statutory or constitutional rights of which a reasonable person would have

---

[7] Plaintiff abandoned his Section 1983 claim against Defendant in his individual capacity by failing to address Defendant's arguments for dismissal of that claim in his response brief to Defendant's Motion to Dismiss. [<u>See</u> Doc. 19 at 8] (staring that Plaintiff "only" seeks relief under Section 1983 against Defendant in his "official capacity"); <u>Fowler v. Univ. Health Servs., Inc.</u>, No. CV 1:24-107, 2025 WL 976289, at *3 (S.D. Ga. Apr. 1, 2025) ("[W]hen an argument is raised that a claim is subject to dismissal, and the non-moving party fails to respond to such an argument, such claims are deemed abandoned."). Despite Plaintiff's abandonment of the claim, the Court must nevertheless review the merits of Defendant's argument to dismiss the claim. <u>Cf.</u>, <u>Giummo v. Olsen</u>, 701 F. App'x 922, 925 (11th Cir. 2017) (requiring a district court to show it considered the sufficiency of the complaint and provide a reason why the complaint failed to state a claim when ruling on an unopposed motion to dismiss).

known." Id. at 762. An official claiming qualified immunity must first show that he acted within the scope of his discretionary authority, meaning he acted "pursuant to the performance of his duties, and . . . within the scope of his authority." Hinson v. Bias, 927 F.3d 1102, 1116 (11th Cir. 2019). "Once an officer has raised the defense of qualified immunity, the burden of persuasion on that issue is on the plaintiff." Corbitt v. Vickers, 929 F.3d 1304, 1311 (11th Cir. 2019) (citation omitted).

Here, Defendant contends—and Plaintiff does not dispute—that Defendant acted in his discretionary authority when he requested Plaintiff's resignation. [Doc. 13-1 at 14; see generally Doc. 19]. Thus, Defendant is entitled to qualified immunity unless Plaintiff shows that (1) the allegations of the Complaint establish a constitutional violation, and (2) the violation was clearly established. Hinson, 927 F.3d at 1116. For the reasons discussed above, Plaintiff cannot do so. Because the Complaint fails to show that Plaintiff's due process rights were violated when Plaintiff voluntarily resigned, Plaintiff's Section 1983 claim against Defendant in his individual capacity is also due to be dismissed with prejudice under Rule 12(b)(6). See Keating, 598 F.3d at 760

### B.    Plaintiff's Defamation Claim (Count Two)

#### 1.    Official Capacity Claim

Defendant argues that, to the extent Plaintiff brings his defamation claim against Defendant in his official capacity, Defendant is entitled to the benefit of

sovereign immunity. [Doc. 13-1 at 16–17] (quoting <u>Carter v. Butts Cnty., Ga.</u>, 821 F.3d 1310, 1323 (11th Cir. 2016)). The Court agrees. In Georgia, "sovereign immunity extends to the state and all of its departments and agencies," including sheriffs. <u>Id.</u> Thus, the only way Plaintiff can assert a state-law defamation claim against Defendant in his official capacity is if Plaintiff "can show that sovereign immunity has been waived." <u>Id.</u> Plaintiff has not done so.

In Georgia, sovereign immunity may be waived only if "a statute expressly provides that sovereign immunity is waived and the extent of such waiver." <u>Id.</u> (citation omitted). Here, none does. <u>Id.</u> "While the State of Georgia waived its immunity for tort claims in the Georgia Tort Claim Act ["GTCA"], it did so only with respect to Georgia *state* employees, not to counties or county employees." <u>Id.</u> (emphasis in original). And, "under the plain language of the Georgia Constitution and the GTCA, sheriffs"—such as Defendant—"are county officials, not state officers or employees." <u>Nichols v. Prather</u>, 650 S.E.2d 380, 384 (Ga. Ct. App. 2007). Thus, because Plaintiff's defamation claim against Defendant in his official capacity is barred by the doctrine of sovereign immunity, it is due to be dismissed without prejudice. <u>See</u> <u>Pelham v. Bd. of Regents of Univ. Sys. of Georgia</u>, 743 S.E.2d 469, 470 n. 1 (Ga. Ct. App. 2013) ("[A] motion to dismiss on sovereign immunity grounds is based upon the trial court's lack of subject matter jurisdiction").

2.    <u>Individual Capacity Claim</u>

Defendant argues that Plaintiff cannot state an individual capacity claim for defamation because the alleged defamatory statements were not false, but rather "substantially true." [Doc. 13-1 at 20]. Plaintiff brings his defamation claim under O.C.G.A. § 51-5-1. Compl. ¶ 64. To establish a claim for defamation under Georgia law, Plaintiff must show: "(1) a *false and defamatory* statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." <u>Am. C.L. Union, Inc. v. Zeh</u>, S.E.2d 422, 427 (Ga. 2021) (emphasis added); <u>see also</u> O.C.G.A. § 51-5-1 ("A libel is a *false* and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule.").

A statement is not false when it is "substantially true" or when a reasonable person would not interpret it to have a false or defamatory meaning. <u>See</u> <u>Bryant v. Cox Enters., Inc.</u>, 715 S.E.2d 458, 467 (Ga. Ct. App. 2011) (affirming the grant of summary judgment to defendant after holding that the allegedly defamatory "articles in their entirety were substantially true at the time they were published"); <u>Lucas v. Cranshaw</u>, 659 S.E.2d 612, 615 (Ga. Ct. App. 2008) (affirming the grant of summary judgment to newspaper defendants after concluding that a reasonable reader would

not have interpreted the article in its entirety to have a false and defamatory meaning); see also Out of Nowhere v. Nolan Transportation Grp., LLC, No. 1:23-CV-00041-VMC, 2025 WL 28012 (N.D. Ga. Jan. 3, 2025) (holding that statements that may give a "false impression" about certain facts do not rend other allegedly defamatory statements "substantially false"),

Further, statements of opinion—which are subjective by definition—are "not capable of being proved false" and generally not actionable. Info. Sys. & Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1228 (11th Cir. 2002) (applying Georgia law). This exception "applies to circumstances in which an employer or manager comments on the job performance of a subordinate." Id. (citing ITT Rayonier, Inc. v. McLaney, 420 S.E.2d 610, 613 (Ga. Ct. App. 1992). However, "a statement of opinion *is* actionable as defamatory if it can reasonably be interpreted as stating or implying defamatory *facts* about the plaintiff and, if so, if the defamatory assertions are capable of being proved false." Bellemead, LLC v. Stoker, 631 S.E.2d 693, 696 (Ga. 2006) (emphasis added).

Here, Plaintiff attributes the following alleged statements concerning Plaintiff to Defendant:

1. Defendant told journalists that Plaintiff's employment ended due to Defendant's efforts to "clean house." Id. ¶ 29.

2. Defendant attributed the delay between Mr. Thompson's death in September 2022 and his "clean[ing] house" in April 2023 to having to wait to "give due process" to Plaintiff. Id. ¶ 30.

3. An April 17, 2023 news broadcast where the commentator stated—based on information provided by Defendant—that "the public outcry over conditions" inside the Jail related to Mr. Thompson's death led Defendant to declare that "[i]t is past time to clean house," and that Plaintiff had resigned along with two other "top ranking jailers." Id. ¶ 42.

4. An April 18, 2023 radio interview where Defendant stated that it was "very true" that the internal investigation into Mr. Thompson's death had brought Defendant back to the radio station for an interview and that "certain people" at the Jail "no longer ha[d] a job." Id. ¶ 41. Defendant also stated that he was "*going* to get to the bottom of what did or didn't happen and hold those people accountable." Id. (emphasis added)

5. An April 20, 2023 press release issued by Defendant stating "after reviewing *preliminary evidence* gathered during the internal investigation being conducted by the Office of Professional Standards," Defendant was "announcing sweeping changes" at the Jail. Id. ¶ 39 (emphasis added). The press release described that the Jail's executive team's many years of experience could "lend itself to complacency" and "stagnation." Id. Accordingly, Defendant said that it was time to "clean house" and referenced that Defendant had "asked, received, and accepted" Plaintiff's resignation as well as two the resignation of two other employees. Id. ¶ 39.

Defendant argues that Plaintiff cannot show that the above statements were false. [Doc. 13-1 at 20]. The Court agrees. Plaintiff cannot show that Defendant did not in fact request Plaintiff's resignation in an effort "to clean house." That statement is a characterization of his actions which cannot be proven false. Additionally, the Complaint contains no statements blaming Plaintiff for Mr. Thompson's death. Rather, at best, the statements show that following public outcry over a tragic situation at the Jail, Defendant decided to overhaul the Jail's senior leadership and asked three officials, including Plaintiff, to resign.

Plaintiff argues that Defendant's statements would "lead a reasonable listener to believe that he was responsible for reprehensible conditions within a jail that lead (sic) to the death of a third party, and that because of such the defendant terminated plaintiff from his job." [Doc. 19 at 18]. Plaintiff contends that this is a "factual message" because it can be proven false and because Plaintiff was not in fact responsible for the death of Mr. Thompson. [Id.] However, contrary to Plaintiff's characterization of Defendant's statements, Defendant's statements convey that Defendant had not yet determined culpability related to Mr. Thompson's death. See Compl. ¶ 41. Rather, after Plaintiff's resignation, the investigation into Mr. Thompson's death was ongoing and Defendant said he was "*going* to get to the bottom of what did or did not happen." Id. (emphasis added). Further, the press release referencing Defendant's intent to "clean house" explained that the Jail's executive team could "lend itself to complacency" and "stagnation" because of their years of experience. This statement provides context for Defendant's decision to ask for Plaintiff's resignation, which would not lead a reasonable reader to conclude that Plaintiff was directly culpable for Mr. Thompson's death. Thus, Defendant's announcement that it was past time to "clear house" following media backlash about the Jail's conditions and Mr. Thompson's death does not reasonably imply that Plaintiff himself was "responsible" for Mr. Thompson's death. See Bellemead, 631 S.E.2d at 696. Further, the mere fact that Plaintiff was never interviewed in

connection to any investigation into Mr. Thompson's death does not show that Defendant made a false or defamatory statement when he said he was waiting to give Plaintiff "due process" before "clear[ing] house." Compl. ¶ 30. Therefore, because the Complaint fails to allege any actionable defamatory statements by Defendant, Plaintiff's defamation claim against Defendant in his individual capacity is due to be dismissed with prejudice under Rule 12(b)(6).[8]

## V.    Conclusion

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Dismiss. [Doc. 13]. Accordingly, the Court **DIMISSES WITHOUT PREJUDICE** Plaintiff's official capacity claims under Count One for compensatory relief and Count Two in its entirety. Additionally, the Court **DISMISSES WITH PREJUDICE** Plaintiff's official capacity claim under Count One for declaratory judgment and Plaintiff's individual capacity claims in their entirety. Because no matters remain, the Court **DIRECTS** the Clerk to **TERMINATE** this case.

**SO ORDERED**, this 5th day of May, 2025.

_Eleanor L. Ross_
Eleanor L. Ross
United States District Judge
Northern District of Georgia

---

[8] Because the Court finds the Complaint fails to state a claim for defamation, the Court need not reach the Parties' arguments about whether Defendant was entitled to the state-law defense of official immunity or whether Defendant made the allegedly defamatory statements as a "public official."